ZINAIDA STALBAN, Doing Business under the Trade Name and Style of OLD RUSSIAN BEAR RESTAURANT, Plaintiff, *v.* SAM FRIEDMAN, as President of the Waiters and Waitresses Union, Local No. 1, and HARRY REICH, as President of the Cooks and Kitchen Workers Union of New York, Local No. 89, Defendants.

Supreme Court, Special Term, New York County, March 30, 1939.

*Louis Zimmerman*, for the plaintiff.

*Drazen & Drazen* [*Jerome Drazen* of counsel], for the Waiters and Waitresses Union, Local No. 1.

*Boudin, Cohn & Glickstein* [*Victor Rabinowitz* of counsel], for the Cooks and Kitchen Workers Union of New York, Local No. 89.

*Louis Maxwell Cohen*, as *amicus curiæ* on behalf of the American Labor Alliance.

COTILLO, J.   The facts in this case establish the female plaintiff as the owner of a small restaurant, located at 645 Lexington avenue, Manhattan, doing business under the trade name and style of Old Russian Bear Restaurant, a purveyor of Russian food, having been so engaged during the last five years.   The restaurant is a very small one, employing four waiters and three kitchen helpers. Plaintiff-owner does part of the cooking herself.   Dinners are sold for eighty-five cents and luncheons for forty-five cents.

A contract was signed October 10, 1937, between the plaintiff and the Hotel Restaurant and Cafeteria Employees' Organization Committee, which terminated April 30, 1938.   The contract was not renewed thereafter, although lived up to by both sides until the restaurant was forced to close on June 28, 1938.   The lease was about to expire then and business did not warrant its continued maintenance.   Its five employees then and there left, received final wages for which receipts were signed, all this taking place volun-

tarily. Of these ex-workers one alone was available and he testified that he had obtained another job shortly after he left plaintiff's employ in June, 1938, and has been employed continuously up to the present time. The others had scattered evidently and could not be located.

Upon the reopening of the restaurant on September 9, 1938, the plaintiff signed a new agreement, *after* she had already hired a totally new crew, with the Delicatessen Restaurant, Cafeteria and Culinary Employees' Union No. 1 of the American Labor Alliance, said agreement to remain under its terms in full force and effect until September 9, 1939. *All of the plaintiff's present employees, seven in number, are members of such union.* The defendants are Waiters and Waitresses Union, Local No. 1, and the Cooks and Kitchen Workers Union of New York, Local No. 89, both affiliated with the Hotel and Restaurant Employees International Alliance and Bartenders International League of America, connected with the American Federation of Labor and with the Central Trades and Labor Council. These two defendant unions began picketing September 9, 1938, the day the new business opened. At first the defendant Local No. 1 used three pickets, while defendant Local No. 89 employed two pickets. These five pickets worked in conjunction with each other through the day and night to about September 19, 1938, when the number was increased to seven pickets. These seven worked continuously from the eighteenth day of September to the twenty-fourth day of September, when they were reduced to six. These six subsequently were reduced to two. The signs carried by the pickets bore the false and misleading statements, as follows:

" Russian bear is on strike."

" Please help us win. We don't want to go on relief."

" Russian bear lockout."

" To the public. We are the original employees of the old Russian bear."

" We have been locked out."

The signs aforementioned were misleading in that none of the picketers were ever in plaintiff's employ. Neither was there a lockout; nor any strike, for that matter. Testimony established acts of violence at various times on the part of the pickets. There were statements that the owner of the restaurant was a " Lousy skirt;" also that " there was a strike " on plaintiff's premises and that the union of her employees is a " fake union " and that the plaintiff's business is not a union shop and that the food served by the plaintiff " was rotten." Physical acts included interference and blocking the entrance to plaintiff's store and preventing customers

from going in. In loud and noisy tones the pickets chanted to pedestrians, " Pass by, pass 'em by."

The plaintiff's manager testified in a manner impressively truthful and showed that on September twenty-fifth defendants' pickets were yelling at customers of the plaintiff, entering or about to enter her store, alleging them to be " White Russians " and " Czarists " and that " they should be driven from the country."

It was established that on November 1, 1938, defendants' pickets, upon noticing a lady with two small children entering the plaintiff's store, ordered her not to enter, saying that the place was on strike, and ended by calling the lady " a lousy skirt."

Again, it was shown that on November 12, 1938, a customer of the plaintiff's restaurant was insulted and stormed at by these pickets, resulting in an altercation in front of the restaurant, and the signs of the pickets were torn down by the enraged customer.

It was established that on February 18, 1939, two pickets opened the door leading to plaintiff's restaurant, shouted into same saying the place was " on strike " and " they sell rotten food," causing a disturbance requiring the aid of the police, who arrested the offenders, and that one of them, named William Norwicz, was convicted on March 6, 1939, after trial before Magistrate EDGAR BROMBERGER.

It is to be noted that in this case both plaintiff and defendant unions sought certification. Each requested of the State Board that it be adjudged entitled to represent the employees of the plaintiff restaurant. A hearing was held before such Board after due notice to all interested parties. At such hearing it was stipulated that Union No. 1 of the American Labor Alliance was an organization coming within the State Labor Relations Act. A decision was handed down by the State Labor Relations Board, the effect of which is a determination that " no controversy exists concerning the fact that this union (American Labor Alliance, Local No. 1) represents your employees." Such decision is referred to in the letter written by such Board to the plaintiff on November 28, 1938, as follows:

" NEW YORK STATE LABOR RELATIONS BOARD
" Southern Regional Office
" 366 Broadway
" New York
" *November* 28th, 1938.

" Old Russian Bear Restaurant,
" 645 Lexington Avenue,
" New York City.
" *Re Case No. SEE–2592*

" GENTLEMEN: On November 21st we sent you a notice of the dismissal of Case No. SE-2646, the petition of the Delicatessen,

Restaurant, Cafeteria and Culinary Employees Union, Local No. 1, for investigation and certification of representatives. As the Board pointed out in that decision, there is no evidence that any controversy exists concerning the fact that this union represents your employees.

" It is likewise clear from the record that no other union claims to have been selected by them as their representative for the purpose of collective bargaining.

" The same situation exists regarding the petition for an election which you yourself filed on September 12th, 1938, and which we have numbered SEE-2595. Under the circumstances, this Board is without jurisdiction to proceed in the matter. The Board has accordingly marked the case closed.

" Very truly yours,
" RALPH T. SEWARD,
" *Executive Secretary.*"

On the other hand, against this viewpoint is the assertion by the defendant unions that a reading of the letter convinces that certification was refused to both by the Board, and that as long as no certification exists picketing is lawful and cannot be enjoined.

Recapitulating the above facts, we have here a small restaurant owner employing seven helpers, picketed by two powerful unions (the defendant locals control 70,000 members of the restaurant help in the city), though she is fortified with a labor contract with a State Board accepted labor union and one hundred per cent of her employees recognize and accept same and are members thereof. She is being picketed with what purpose? Is it to compel the plaintiff to break her contract with the American Labor Alliance? Is it to compel the plaintiff's employees to join the defendant unions? Are there mixed purposes here? The answer to these questions must be looked for as much by the effects they produce as by undisclosed intentions.

The plaintiff has established by a preponderance of credible evidence her allegations of coercive picketing. The facts recited above show conclusively, in this court's opinion, a plan to accomplish an illegal purpose. There has been harassment, unfair conduct and violation of plaintiff's rights which require this court's protection.

Is there here a labor dispute? The statute made and governing in this instance is subdivision 8 of section 701 of the New York State Labor Law. There it is stated: " The term ' labor dispute ' includes, but is not restricted to, any controversy between employers and employees or their representatives as defined in this section concerning terms, tenure or conditions of employment or concerning

the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to negotiate, fix, maintain or change terms or conditions of employment, or concerning the violation of any of the rights granted or affirmed by this article, regardless of whether the disputants stand in the proximate relation of employer and employee."

This section is identical with the Wisconsin Labor Code, section 103.62, paragraph 3. This latter section has been made the subject of litigation decided in the United States Supreme Court and, because of its identical phraseology, is vehemently urged as making the law by which this court is bound and which it must follow. (*Lauf* v. *Shinner & Co.*, 303 U. S. 323.)

As the facts in that Wisconsin case and those at bar are alleged to be alike, we revert to same in some detail. In the *Lauf* case the facts established two labor unions picketing an employer. The findings of fact made there by the *Federal District Court and which were not disputed by the defendant unions* in Wisconsin are that " the unions demanded the employer require all his employees, on pain of dismissal, join said unions; the employees though left free in the matter by the employer refused to join, having an organization of their own. The employer thereupon rejected the unions' demand and the union members, for the purpose of coercing him, and in a conspiracy to destroy his business if he refused to yield, caused false and misleading signs to be placed before his market; caused persons who were not in his employ to parade and picket before the markets; falsely accused him of being unfair to organized labor in dealings with employees, and by molestation, annoyance, threats and intimidation, prevented patrons and prospective patrons of the employer from patronizing the markets. Irreparable damage resulted." The District Court issued an injunction on such findings and the Circuit Court of Appeals sustained same; but the Supreme Court reversed both lower courts and dismissed the injunction. Arguments advanced thus far by the defendant unions seemingly support their side. But a careful reading of the *Lauf* case established that it is no precedent upon which they can rely. The basis for the Supreme Court's reversing the lower courts was two-fold: (1) That the Wisconsin Labor Code (by section 103.62 of that Wisconsin statute) had established that under the facts there cited a labor dispute existed; and (2) that the District Court was without jurisdiction to grant an injunction in the absence of findings of fact required by the Norris-LaGuardia Act (29 U. S. Code, §§ 151–166). Then, because the two lower courts had not passed on the questions of the legality of the acts committed under the picketing, under the Wisconsin law, no expression concerning the legality or propriety of such acts could be passed upon by the

Supreme Court, and so the whole matter was remanded to the District Court for further proceedings, in accordance with the opinion expressed by our highest court.

That case, briefed *in extenso* by the defendant unions, came up in a Federal District Court because it involved diversity of citizenship and an amount over $3,000. Significantly, Judge ROBERTS' decision in effect held that the District Court could do only that which the statutes of the United States authorized it to do. And the law covering the interpretation of the Wisconsin Labor Code would have to be taken by the District Court as interpreted by Wisconsin's highest court. The Federal District Court's powers were further limited, in addition, by the provisions of the Norris-LaGuardia Federal statute, that Congress had definitely limited the powers of Federal courts and that this District Court had not made the findings required of it under that Federal act.

Finally, there was the fact that the Supreme Court of Wisconsin had spoken concerning section 103.62, paragraph (3), and if the Supreme Court had no power to declare peaceful picketing unlawful, the District Court had no greater power. Most important, since the two lower courts had interpreted the statute erroneously and had found that no labor dispute existed, they did not pass on the question of the legality of the acts committed in Wisconsin under the Wisconsin statute. Therefore, the case was sent back for further proceedings. This case can hardly, then, be declared a precedent binding upon this court.

The defendants rely on *New Negro Alliance* v. *Sanitary Grocery Co.* (303 U. S. 552). That case specifically related to an interpretation of the Norris-LaGuardia Act. The court held that " the court does not concern itself with the background or the motives of the dispute," making clear that it is a procedural statute. The case itself, therefore, is an interpretation of a Federal statute. (U. S. Code, tit. 29, § 163.) It is urged here, however, that section 152, subdivision 9, defines a " labor dispute " in almost identical terms as does the New York State Labor Law (§ 701, subd. 8). The answer to this is that, assuming this to be so, our own Court of Appeals has yet to express itself on that point. In fact, it specifically left the question open in the case of *Goldfinger* v. *Feintuch* (276 N. Y. 281), where Judge FINCH used the following language: " Whether this statute is merely an expression or an extension of the principles of the common law and equity as applied to labor injunctions and stated in the opinions of this court, need not now be considered." (276 N. Y. at p. 288.)

On the contrary, against the defendant's contention may be offered the statement of Chief Justice TAFT in *American Steel Founderies* v. *Tri-City Council* (257 U. S. 184), in referring to the

effects of Congressional statutes relating to restraints upon the issuance of court injunctions, that they introduced " no new principle into the equity jurisprudence of those courts. It is merely declaratory of what was the best practice always. Congress thought it wise to stabilize the rule of action and render it uniform " (p. 203). Assuming this to be true, the answer to the unsettled question mentioned by Judge Finch concerning a statute like section 876-a of the Civil Practice Act, prohibiting the issuance of an injunction in a labor dispute, must be held to work no change in the substantive law of the country, but to be merely declaratory of what was in fact the best equity practice.

Our Court of Appeals has yet to speak on the same section of the Labor Law of this State under such a state of facts since the passage of the State Labor Relations Act, though it has taken a stand on another aspect of this same issue *before* the passage of the act. (*Stillwell Theatre, Inc.*, v. *Kaplan*, 259 N. Y. 405.) The question involved is the same as that specifically left open in 1928 in *Interborough Rapid Transit Co.* v. *Lavin* (247 N. Y. 65), where the court, per Lehman, J., said: " This court has not yet been called upon to decide whether employees may legally be urged to make a choice in breach of a definite contract."

Then, in July, 1932, came the *Stillwell* decision, which made a definite statement about an economic result, but used language requiring (a) further refinement in the light of its economic effects: (b) reconsideration in the face of a mass of newly-enacted labor legislation. The *Stillwell* case spoke of " incidental injury " which an employer was required to bear, and it referred to " conduct which is within the allowable area of economic conflict."

Since the passage of numerous labor protective statutes such general language has produced various unintended effects of a substantive character. Such language calls for further clarification if it is not to remain a form of pernicious abstraction. Noteworthy, concerning any discussion of subsequent redefinitions, are the statements used in two Court of Appeals cases which followed the *Stillwell* case. In *J. H. & S. Theatre* v. *Fay* (260 N. Y. 315 [1932]) the court (at p. 321) said: " The scope of the injunction is ' something to be determined in the exercise of a wise discretion.' " Then, significantly again, in *Wise Shoe Co.* v. *Lowenthal* (266 N. Y. 264 [1935]) (at p. 268) the court said: " We have to fit the law to each set of facts."

Clearly the Court of Appeals anticipated that the phrases " incidental injury " and " allowable area of economic conflict " must not be allowed an unwarranted prolongation of life by reason of any sterile refinement.

Here the dispute is not between the owner and the competing unions, but this action is one for an injunction and is brought by the owner of a restaurant who seeks to enjoin two trade unions from picketing plaintiff's place of business. The two actual defendants in the case before me are Waiters and Waitresses Union Local No. 1 and the Cooks and Kitchen Workers Union of New York, Local 89, affiliated with the American Federation of Labor.

In this case it must be borne in mind the evidence shows both the American Labor Alliance and the two defendant unions sought certification. Both sought to secure, in addition to their *existing* rights and claims, the prestige and authority of a Labor Board certification. For the two defendant unions the certification would have given them powers which they concededly did not possess (stipulation before the State Labor Board was entered into to the effect that the defendants made no claim that they represented any of the plaintiff's present employees), namely, the right to compel the plaintiff to bargain with and to recognize it. For the American Labor Alliance, the other principal in the certification question, said certification would have the effect of conveniently disposing of an issue between it and the two defendant locals.

Is certification necessary to establish or to end a labor dispute? Obviously not. There are many labor disputes which never go to certification. The act itself does not require it. The act requires that the employer sincerely negotiate; it does not even require that the bargaining unit be in the form of a labor union; a committee or other group suffices. What would certification do more than is shown to have been done here? The plaintiff's seven employees have signed agreements and have expressly refused to join defendant locals. This fact, together with the evidence adduced at the trial, leads to the inescapable conclusion that the picketing is coercive and designed to destroy the business of the plaintiff. Both the defendant locals are powerful, long-established unions. Up to the present time, according to the evidence, they have effectively destroyed forty per cent of the plaintiff's small retail trade. In the mind of said defendant locals it is established beyond peradventure of doubt that the small restaurant owner cannot long survive; that what she is gambling with is not only her livelihood in this restaurant business but also her small invested savings. Thus, if unsuccessful, she will be deprived of the opportunity to earn her livelihood further in that way. Under these facts her economic extinction is preordained. To say that this is not within the distinct cognizance of the defendant locals or beyond their implied, if not expressed, purposes, is to ignore realities and to indulge in specious reasoning.

Inextricably interwoven with this dominant unlawful purpose was another equally abortive one, although such other purpose is not the present subject of this case. The two defendant locals look with scorn and contempt upon the American Labor Alliance. They claim it to be an interloper trespassing in reserved areas. They also claim that same is not a *bona fide* union; but offer no proof thereof. Their allegation that the plaintiff's workers do not receive the current rate of wages paid to waiters and kitchen help has not been substantiated; nor their claim that working hours are kept prejudicial to the interest of this type of worker. The credible proof submitted establishes that the same wages are paid the plaintiff's workers as are received by union help elsewhere, and that no less advantages in working conditions exist comparatively speaking. The defendant unions' contention is that the American Labor Alliance is a novice in the field; possessed of little or no capabilities in procuring benefits for its members, and that it is a scheming and conniving sort which places it beyond protection of our law. Which of these motives is primary and which is incidental in the instant picketing as presently conducted? Is it the destruction of plaintiff's business or the destruction of the weak and small union? Is equity impotent here? The gain to the defendant labor unions in eliminating their weaker opponent by the courts following a policy of abstention in such economic struggle for supremacy between the defendant unions and the American Labor Alliance is considerably less than the damage done by allowing such economic conflict to destroy private initiative; approve the confiscation of property rights and expose the small business man to the fury of a conflict in which he is an innocent by-stander, though complying with every obligation within the field of labor relations imposed upon him by law.

Would the 1932 *Stillwell* decision assert in 1939 that this is *incidental* damage and not a mortal wound which this small employer is suffering; and is the struggle for supremacy between the weak union and the two powerful defendant unions a form of strife within the allowable area of economic conflict? And is the resulting or consequential damage flowing from such conduct to be borne without relief or remedy by the innocent employer? Must the plaintiff be left helpless and allowed to be crushed between two grindstones?

Do the words uttered in the *Wise Shoe* case, that the courts will fit the law to the facts in each case, and the statement that the exercise of a wise discretion by the trial judge in each case is to control in determining the scope of the injunction, mean anything? Yet both these latter statements postdated the *Stillwell* decision.

Furthermore, do they mean anything in the face of existing protective labor measures, whose like have been unparalleled heretofore? Can the cloak of protective statutory enactments be distorted to the end that they can be legally turned into menaces against other classes? Directly and unalterably the picketing herein involved is an attempt to compel the plaintiff to break her contract with the American Labor Alliance. The coercion attempted is that aimed by a process of slow attrition to gradually weaken and render the small employer destitute. The plaintiff's forty per cent loss of business, if continued, unalterably spells this conclusion. Having thus approached the problem, we are at this point informed that all this conflict represents merely economic issues; that if the little restaurant fails or closes up, it is merely " incidental " injury and must be borne because such " conduct is within the allowable area." Both quotations are from the *Stillwell* case. This court experiences the same difficulty which other courts have at other times so well expressed. Thus it has been said: " The purpose of the picketing, of course, is to persuade customers not to trade in this store, to the end that the plaintiff, yielding to this pressure, will break its present agreement with the American Federation of Labor. It is, of course, not to apprise plaintiff's employees of the situation or to prevail upon them to join the defendants' union. If the plaintiff yields to defendants' importunity the unions with whom it has contracted will then have just cause for picketing its business. The plaintiff finds itself between the upper and the nether millstone in a quarrel between the two great labor organizations of this country. If picketing were not detrimental to the plaintiff, it would not be engaged in, but the highest court in this State has said, and reiterated, that since picketing is legal, ' resulting injury is incidental and must be endured.' (*Exchange Bakery & Restaurant, Inc.,* v. *Rifkin,* 245 N. Y. 260, 263.) *I cannot reconcile this statement with the principle that one may not exercise an undoubted legal right in such a manner as to injure an innocent party. I find myself in accord with the dissenting opinion* of Judge O'BRIEN *in Stillwell Theatre, Inc.,* v. *Kaplan* (259 N. Y. 405)." (*Buy-Wise Markets, Inc.,* v. *Winckur,* 167 Misc. 235, WENZEL, J.) (Italics ours.)

That outside jurisdictions have experienced the same forebodings or misgivings is shown by the opinion of the learned Vice-Chancellor BERRY in *Dolan Dining Car* v. *Cooks & Assistant Cooks Local No. 399* (124 N. J. Eq. 584; 4 A. [2d] 5), November, 1938, as follows: "And this leads to the question as to the extent to which organized labor is to be permitted to control small business. The individual shopkeeper — the small business man — who employs but a half

dozen men, will be entirely at the mercy of a labor organization if it is permitted to employ the same tactics against small business as it usually employs against big business — great aggregations of capital. Of course, the unionization of complainant's business, in which but three men are employed, would not be a serious blow to the open shop; but by the same token, no great advantage to organized labor can result from its unionization — unless it be a step towards monopoly. From the standpoint of labor, a business like complainant's is ' small change,' but to the small business man his business may, and usually does, represent his life's work, his all. Vice-Chancellor BIGELOW recently had occasion to enjoin the picketing of a shoe shop whose *one employee had gone on strike.* (*Diamond* v. *United Retail, etc., Local 198,* Docket 122, page 702.) The picketing in that case resulted from a refusal of the employee to bargain with the union. The practice is not locally confined, by any means. See *Senn* v. *Tile Layers Protective Union* (Wisconsin), 81 L. Ed. 829 (U. S. Sup. Ct.). It does not appear in the instant case that it was at all necessary for these three employees, working in the same room with their employer, to enlist the services of the business agent of the defendant-union in negotiating for higher wages and shorter hours; their own efforts, had they made any, might have proved more successful. The plain inference to be drawn from the circumstances is that force, economic coercion and intimidation, fear of business ruin, not argument or persuasion, was the motivating influence to be used against the employer. The employer was to be compelled to accede to the union's demands, or be crushed. Against the power of the union the complainant is absolutely defenseless. He must either submit or go out of business. An employer whose business requires the services of only three men should be entirely free to choose his employees from the open labor market, union or non-union, as he pleases. Any restriction upon that right is almost certain to be destructive of the right itself. The facts here justify that statement." (*Dolan Dining Car Co.* v. *Cooks & Assistant Cooks Local No. 399,* 124 N. J. Eq. 584; 4 A. [2d] 5, 7.)

The latest similar pronouncement is from the United States Court of Appeals for the District of Columbia in a case involving Fur Workers Union Local 72 and members of the International Fur Workers, affiliated with C. I. O. That court, in referring to the damage visited upon the employer when two unions strive for supremacy, said: " The union which believes itself to represent a majority will have no incentive to apply for an election, and the union which apparently has less than a majority may resist an election. It is clear, further, that in such a situation, there is no

remedy for the employer. * * * *The result is an inequality before the law; that while the employer has a substantive right to carry on his business, he lacks a legal remedy for protecting the same against injury through the struggle of competing unions though he be indifferent as to the choice of his employees between them."* (Italics ours.) (Decided March 27, 1939.)

The State of Wisconsin, notably a liberal and progressive State in socio-political experimentation, presented to its Governor for signature a bill passed by both houses making it unlawful to engage in picketing where no labor dispute existed. Under such law the instant defendant locals' conduct would be illegal (N. Y. *Times*, March 30, 1939).

Defendants further rely on the contention that our Court of Appeals in the *Stillwell* case (259 N. Y. 405 [1932]) and in *Exchange Bakery* v. *Rifkin* (245 id. 260 [1927]) said that picketing *per se* connotes no evil.

The court distinguishes those cases. The real nub of the *Stillwell* case is contained in the decision by that court that where solely economic issues are involved the court *ordinarily* will not interfere. If this be so, it becomes important to determine with what motive the picketing under review is being conducted. When the Appellate Division in the *Stillwell* case reversed Special Term in denying the injunction, it was because the Appellate Division found that the picketing there conducted was in furtherance of an unlawful objective, namely, to induce the plaintiff to break its contract with its competitor labor union. The motives with which picketing was being conducted thus became decisively determinative of those issues in that intermediate court. In the Court of Appeals, however, the decision in the *Stillwell* case was that the court would not undertake *up to that time* (italics ours) to decide such economic and social issues if no *violation of law* were involved; that if injury resulted therefrom it was an injury which the employer had to bear.

Without more, this statement in the *Stillwell* case raises important social and economic issues impossible then to have been immediately foreseen. Uttered during the previous administration, conditions then warranted no foreshadowing of the future labor legislation which was to follow commencing three years thereafter. The effect of the *Stillwell* decision requires it to be reconsidered, not as it stood alone in that *labor statute-less day*, but in its relation to the many new and current consequences. Especially is it to be reconsidered in the light of the qualifying statement issued thereafter and heretofore mentioned, found in the *Wise Shoe* case and the *Fay Theatre* decision. These consequences are so crucial that they compel reconsideration in the light of the many new protective statutory measures passed since that decision became law.

When the *Stillwell* case was decided we had no Federal Labor Relations Act (July, 1935) nor any New York State Labor Relations Act (May, 1937). This means we had no official acceptance of the principle of collective bargaining (*Texas & N. O. R. Co.* v. *Brotherhood of Railway & S. S. Clerks*, 281 U. S. 548; *Virginia Railway Co.* v. *System Federation No. 40*, 300 id. 515), nor any widespread and general recognition of the working value of procedural statutes, like the Norris-La Guardia Act, passed shortly before (March, 1932), nor of the Quinn-Neustein Act (April, 1935) of this State, nor its companionate measure, the Civil Practice Act provisions under section 876-a (April, 1935). We had no decision upsetting a long line of Federal cases and distinguishing "manufacturing" as being *within*, not outside the area of interstate commerce; therefore, making all labor relations appurtenant thereto subject to Federal regulation, whether such "manufacturing" or even other activity involve a large steel corporation (*National Labor Relations Board* v. *Jones & Laughlin Steel Co.*, 301 U. S. 1); or the manufacture of tractors and automobiles (*National Labor Relations Board* v. *Fruehauf Trailer Co.*, Id. 49); or clothing (*National Labor Relations Board* v. *Freidman-Harry Marks Clothing Co.*, Id. 58); or the operation of interstate buses (*Washington, Virginia & Maryland Coach Co.* v. *National Labor Relations Board*, Id. 142); or the publishing of newspapers (*Associated Press* v. *National Labor Relations Board*, Id. 103); or even the canning of fruits (*Santa Cruz Fruit Packing Co.* v. *National Labor Relations Board*, 303 id. 453). All are now subject to a new Federal relationship because of labor relations appurtenant thereto.

In the instant case the plaintiff is a small restaurant owner. She is by such token called an entrepreneur. She falls within a group which in number, throughout industry, runs into many hundreds of thousands. The slim economic margin between success or failure in these myriad thousands of small retail businesses or establishments is quickly consumed. Too great a measure of the "incidental injury" referred to must represent serious damage, not merely incidental damage to all such small business. If the employer, on the other hand, is a million-dollar corporation, the statement made by the court in the *Stillwell* case makes readily understandable logic. In the instant case, to speak of picketing being permitted because economic issues are solely involved, would drive the plaintiff's business to the wall. Bankruptcies must obviously increase under such circumstances and scores of small enterprises be forced to give up. Added unemployment must increase thereby, and financial reverses be augmented. *Can* unions be trusted with such power? *Should* unions be trusted

with such power? *Were* unions intended to be trusted with such power?

In the light of these questions and the responsibilities they create, this court is justified in proceeding with great caution; it seeks to query not only the purpose for which picketing is being conducted, but, equally important, to examine the question of what effect such picketing would have upon the enterprise owned by the small business man, lest there be *violation of law* as a result. Here what is involved is not a conflict between capital and labor in any real sense, because to classify this small restaurant owner as a capitalist is to disregard realities. *She is the person in between two larger groups, each powerful in its sphere, and what is more important, each of whom is protected by special legislation. That she has no special protection — is all too obvious.*

With what motives is picketing being conducted by these unions? Is it not coercive? And above all, is it not a species of fraud which equity can enjoin? Masking covertly, if not openly, under the guise of an existing labor dispute, but with the ulterior purpose of catching its labor union opponent on the hip in order to deliver a death-dealing blow, it is using its coercive pressure on this innocent restaurant owner, making her its unwilling shield and even tool, and through her striking at its opponent.

The purposes behind such chicanery can succeed only if the restaurant owner yells for mercy in the one voice recognizable in such a dispute — namely, her expressed willingness to commit a breach of her contract and thus do the American Labor Alliance a legal wrong. The defendant unions can win such battle only by *creating* a legal wrong. Thus they profit from their own tort. Such conduct is illegal. There being no labor dispute, to permit picketing is to condone of necessity an illegal purpose. It is no answer to state merely that picketing must be permitted if it is peaceful and if solely economic issues are involved. Such statements clearly are incomplete and if the effect is to close up the small business, it is positively a menace to modern industry. Not alone the motives, but also the effect of such unrestrained picketing constitute the gravamen of the offense charged.

In the instant case we have more than merely an economic issue. We have false, misleading statements, offensive acts and misconduct, and language which, if continued, would inevitably result in irreparable damage. Most important of all, back of the instant picketing is the determined plan to crush the plaintiff's entire economic establishment and wipe out her financial investment, unless she performs the required illegal act of breaking her contract with the American Labor Alliance. By no other choice

can she buy her peace or salvation. *To act lawfully is to succumb. To act unlawfully is to succeed.* This curious anomaly represents not what was intended under the *Stillwell* case, but merely one of the unforeseen results of a complex industrial situation where labor relations still remain in a state of fluidity. This is the type of case which calls for the court's exercise of its equitable powers by a wise discretion and acting to prevent a manifest wrong. It falls within the exception stated in the *Fay* decision. It is the *elan vital* behind the statement heretofore made in the *Wise Shoe* case that the law must be fitted to the facts of each case, *the Stillwell decision notwithstanding.*

The defendant locals rely on *Exchange Bakery* v. *Rifkin* (245 N. Y. 260 [1937]). This too is a case decided before section 876-a of the Civil Practice Act and other legislative acts were passed. However, it is to be noted, with all that was said by that court, the essence of the decision is that the acts complained of were that an alleged contract signed by the employee-waitresses not to join a union was of no legal force and effect, being merely a promise given by them without consideration. In doing this much, the New York court was repudiating the Federal doctrine sustaining yellow-dog contracts. It said so in specific language. As for the alleged picketing, Judge ANDREWS said that such conduct as was entered into was not, strictly speaking, picketing at all, but merely isolated unlawful trespasses or tortious acts which could have been restrained by law. The court there held that the blowing of a whistle, the signal for a strike, was an isolated act of violence and not a form of picketing. The court also added, however, that where unlawful picketing had been continued, where violence and intimidation had been used, and where it is reasonable to anticipate irreparable damage to the employer's business, a broad injunction prohibiting all picketing may be granted.

What is involved in the case before this court is no mere exercise in dialectics. We are concerned with the disappearance of a numerous small entrepreneur class risking its few dollars through business initiative and seeking to earn a living in much the same manner as the ditchdigger, bricklayer or carpenter, commonly designated as to proletariat, does. The lot of both is well known — hard work, long hours, small compensation. Against his extinction as a member of the great middle class making up the backbone of America, equity may not support a doctrine hostile to all equity law. For equity to be silent here is to acquiesce in the arraignment of one class against another, and passively watch the extinction of the one by the other in openly declared impotence. Such a cowardly practice violates not merely equitable, but also democratic

principles. It is likewise distinctly at variance with fair play and ultimate labor union interests, because no class in a democracy can afford to have others succumb to it by reason of legislative fiat. The American system compels the members of all classes to sustain themselves by economic ability in the open forum or free market place, where the forces of competition and free enterprise concededly dominate through the survival test. Anything which is at variance with the above-expressed principles is altogether unacceptable. To pass legislation which rules for the advantage of one set of individuals as against another is far different from approving of measures to insure against the continued suppression of the labor class as a whole. By legalizing collective bargaining, by prohibiting the abuse in the granting of unjust injunctions, by preventing discrimination against individuals because of labor activity, by clothing picketing with the constitutional guaranties of free speech, we have deliberately sought to equalize a former disparity existing between two disputants. But the continued solvency of no one must depend on new potency found through any new legalization of the power to coerce by labor union picketing, as here. If this be heresy which is here expressed, it is economic, not legal heresy, because equity must ever refuse to stand idly by and see the sole property or means by which one class can subsist surreptitiously wiped away and destroyed by conniving opponents through a species of fraudulently disguised picketing operations, and yet not be able to stem such destruction. Not even recently passed labor legislation has deprived courts of equity of their power to function in the face of fraudulently disguised motives behind such illegally motivated picketing.

Less of property rights than human rights is involved here, because it is not the few dollars which each small entrepreneur already possesses that are most important to consider. *It is expropriation of an entire class from our social order.* It is this which justifies equitable action where the effect behind such picketing is to crush a small entrepreneur to the end that he finds it economically profitable to break his contract and commit an illegal act in order to survive. No dialetic, in whatever channel it seeks to pursue its objectives, whether by capitalism or proletarianism, can justly narrow the allowable arena of conflict if its effect be the extinction of any unprotected class, leaving other classes beneficially shielded.

To think of this as a narrow combat between two labor unions or between labor and capital alone is to fail to see the deeper fundamental issues. Actually involved here is the power of a free economic industrial order to maintain itself unimpaired against

fascistic influence expressed through the dominance of any one group or any one set of economic principles. *Allowable economic areas can only be talked about in such terms as the above illustrations afford or else we are dealing in mere words.* That very court, in the *Stillwell* decision, said significantly (at p. 409): " When dealing with legal problems enmeshed in dynamic social forces, courts ought to decide only the cases before them and to *remain open to all the wisdom the future may hold.*" (Frankfurter and Green, The Labor Injunction, p. 42.)

As if made to order for this occasion, the *Stillwell* decision creates the loophole for its own modification in the light of currently passed statutory labor safeguards. It is just as if the courts had a premonition that at some later date they would be called upon to intervene *and not to remain aloof* and to determine in accordance with historic equitable principles, the conflicts, both social and legal, engendered, or as it is stated in the above quotation " enmeshed in dynamic social forces."

*The invitation to courts today is thus extended to them to intervene. They are neither barred nor prohibited; but are expected to function. Far from fettering equity, the Stillwell decision must be, by redefinition, considered the open sesame to the exercise of true equity.*

It is obvious that the main purpose of the numerous statutes, procedural remedies and changed interpretations of our Constitution which have recently come from within the field of labor relations is to widen the area within which labor may function and seek its legitimate goals. Two chief methods have been pursued; one to enlarge the area of permissible economic activity, the other to restrain unwise judicial inhibitions. So far as strikes are concerned in this day, they have needed no special protection. So far as boycotting is concerned, the modern approach has been to extend protection to even a secondary boycott, if a sufficient " unity of interest " has been established. (*Goldfinger* v. *Feintuch, supra.*) When we come to injunctions, the tendency has been to permit their complete abolition, if the conduct complained about does not involve fraud, violence and misrepresentation. (Frankfurter and Green, The Labor Injunction, [1930], chap. V.)

The expression of all such purposes meets every progressive viewpoint. But when picketing has illegality of purpose, as its objective, however it be disguised with other motives, if it is primarily designed to coerce and to destroy that which it finds opposing it, we face a species of fraud and violence which equity frowns upon and cannot ignore. Such attempted subjugation of the small employer thus becomes unlawful interference by defendants outside the allowable area of industrial conflict. It

cannot be legalized by statutory enactments. (*Truax* v. *Corrigan*, 257 U. S. 312.) It is wholly destructive of the historical power of equity to intervene. (*Lauf* v. *Shinner & Co.*, 303 U. S. 323, at p. 340, BUTLER, J.)

The court frankly notes its reluctance in thus stating its inability to follow unreservedly the *Stillwell* doctrine enunciated by the learned Justice POUND. Such reluctance persists in the face of the many new stabilizing safeguards thrown around labor's interests and non-existent in 1932, when that decision was written. The court further believes that the changed circumstances occurring since 1932 require refinement of the *Stillwell* doctrine, or else we face the threatened extinction of many small entrepreneurs which can only be prevented if new life be pumped into the phrases uttered *since* the *Stillwell* case and which are found in the *Wise Shoe* case and in the *Fay* decision earlier mentioned. Clearly heed must be taken soon; else pernicious abstractions must continue to work grievious harm. No other way is open to us if modern picketing technique is to be sterilized against anti-social uses to which a limited number of labor leaders have prostituted their newer devices all to the detriment of small middle class businesses. *Any refinement of the Stillwell doctrine does not mean its extinction; but logic demands that the phrase " allowable area of conflict " be construed so as to give back to our courts its equity powers in labor relations, at least to the extent of enabling them to thwart union conduct when and if its purpose is to induce by pressure the breaking of lawful contracts. More than that is not immediately demanded in this case.* The basis for the demanded refinement here is a frank recognition that behind such unlawful pressure is a species of fraud practiced not by all but only by some unscrupulous unionists, when they deliberately seek to use innocent third parties, through the artifice of picketing, to help win for them their struggle for economic supremacy over opponents within the same area. American courts must apply justice in the American way if we are to maintain our democracy.

An injunction will be issued restraining the defendant unions from picketing in front of the plaintiff's store inasmuch as the evidence proved at the trial of this action establishes the non-existence of any labor dispute. The court finds that the injury resulting from such picketing represents irreparable damage which will inevitably work towards the bankruptcy of plaintiff's business, if picketing continues.

Judgment for the plaintiff. Settle findings of fact and conclusions of law together with proposed judgment.