## Pando v. Bartenders' International Alliance, Uniontown Local No. 78, et al.

*Harry W. Byrne*, for plaintiff.

*W. Brown Higbee*, of *Lewellyn, Higbee & Higbee*, for defendants.

DUMBAULD, P. J., January 24, 1940.—Plaintiff operates a restaurant at 68 West Main Street, Uniontown, Pa. His place of business holds a liquor license. He employs regularly a cook, two waitresses, a bartender, and, on busy days, an extra bartender and an extra waitress.

Uniontown Local No. 78 of the Bartenders' International Alliance is located in Uniontown. It is a unit of the American Federation of Labor. Defendant, Hotel and Restaurant Employees International Alliance, Uniontown Local No. 369, is also a unit of the American Federation of Labor, operating in Uniontown.

Until May 1939, plaintiff contracted with the Uniontown Local of defendants as the agent for collective bargaining with his employes. That contract is in writing. It is not for any specific period of time. It contains no definite provisions for termination.

Plaintiff testifies that it expired in May 1939. Later, plaintiff's employes all joined the United Malt Beverage Distributors. This organization is a unit of the Congress of Industrial Organizations. All of plaintiff's employes became members of the local unit. Plaintiff, having terminated his contract with defendant, on August 17, 1939, entered into the new contract with United Malt Beverage Distributors. Thereupon Local No. 78 started a campaign to compel plaintiff to rescind this contract with United Malt Beverage Distributors, to employ as his help members of defendant unions, and to require a renewed allegiance to defendant locals.

A system of picketing was established. A man with a sign on his back paraded back and forth on the sidewalk in front of plaintiff's place of business. This happened every day in the week except Sunday and continued from 11 to 2 in the forenoon and from 4 to 9 in the afternoon. On Saturday, the picket stayed until 11 p.m. From some time in September until the granting of the injunction, this picketing continued. The picket carried a placard bearing the legend "Unfair to organized labor, Bartenders Union No. 78, Waitresses Union No. 389".

No violence is alleged or proven.

Plaintiff's place of business is located in a locality that is strongly inclined to organized labor. Publicizing plaintiff as unfair to organized labor would unquestionably hurt plaintiff's business. A continuance of this system of picketing indefinitely cannot help resulting in the ultimate destruction of plaintiff's business.

With such a state of facts we are confronted with the problem of determining whether or not equity has jurisdiction to restrain, by injunction, this picketing of plaintiff's place of business.

This is no easy problem. We find two gigantic labor unions engaged in a struggle for supremacy. We cannot fail to note that a Nation-wide conflict exists between the American Federation of Labor and the Congress of Industrial Organizations. The local units of both these unions are but cogs in the machinery by which this conflict is carried on.

When they meet in this local area, plaintiff, the innocent bystander, falls between the lines of battle. When he signs up with C. I. O., A. F. of L. destroys his business in its effort to compel him to change his allegiance. If he yields, repudiates his contract with C. I. O. and returns to the A. F. of L., we can readily foresee how his business would at once become the storm center of a counter-attack.

The evidence adduced at the trial leads to the inescapable conclusion that the picketing is coercive and designed to compel plaintiff to violate the terms of his contract, and, upon his failure so to do, to continue the attack until his business is destroyed. In the contemplation of defendants, the small restaurant owner cannot long survive; for what he is gambling with is not only his livelihood in this restaurant business, but also his investment. If unsuccessful, he will be deprived of the opportunity to earn his livelihood further in his business. He will forfeit his investment. Under these facts, his economic extinction is certain. To say that this is not within the distinct cognizance of defendant locals, or beyond their implied, if not expressed, purposes, is to ignore realities and to indulge in specious reasoning. The effort to compel plaintiff by coercive picketing to breach his contract with the United Malt Beverage Distributors is clearly unlawful. Whether the dominant motive of the picketing is coercion of plaintiff into an unlawful act, or the crushing of its rival labor union, can make no difference. Which of these motives is primary and which is incidental in the conduct of the system of picketing need not be determined. In either event the means selected are unlawful. Whether it is the destruc-

tion of plaintiff's business or the destruction of the rival union, the unlawfulness of the purpose still stands out. If a court of equity must stand by and permit such a contest to destroy private initiative; if we, by silence, approve the confiscation of property rights, and expose the small business man to the fury of a conflict in which he is an innocent bystander, though complying with every obligation within the field of labor relations imposed upon him by law, we must then admit that the time when every wrong could be redressed in some form of action has passed.

With such a set of facts before us, does the court have jurisdiction in equity to change this situation and to protect the unoffending employer, the innocent bystander, from the financial ruin that impends?

In our law student days, we defined as "equity" the correction of that wherein the law, by reason of its universality, is deficient.

We know of no effective legal remedy for plaintiff and for thousands, if not hundreds of thousands, of small employers situated as he is. If equity lacks jurisdiction, the courts are impotent, and plaintiff and his kind are helpless. . . .

[The court here quoted at length from Stalban, etc., v. Friedman, etc., et al., 171 Misc. 106, 11 N. Y. Supp. (2d) 343, and United Union Brewing Co. v. Beck et al. (Washington, 1939), 93 P.(2d) 772.]

We have quoted at great length from the opinion of the chancellor in these cases because the facts are so similar to the facts in the case we are here considering, and because the chancellor, in each case, propounds a philosophy with which we agree.

It must not be forgotten that defendant O'Hern, president of defendant local, frankly states that the purpose of the picketing was "To inform the public in general that they [plaintiff] are not fair to organized labor; to persuade them [plaintiff] to put in union members—union bartenders."

The statement carried by the picket on the placard that plaintiff is unfair to organized labor is an actual falsehood. The most that could be said by these defendants is that plaintiff is unfair to the local unit of the American Federation of Labor. To arrogate to themselves the right to say that a contract embracing a hundred percent membership of plaintiff's employes in a unit of the Congress of Industrial Organizations and the selection of that unit as the agent for collective bargaining of all his employes was unfair to organized labor as a whole, is equivalent to saying that the American Federation of Labor is the whole of organized labor.

The court cannot say that the Congress of Industrial Organizations is not a labor union. It has been so recognized as a National, if not an international, labor organization, and it dominates organized labor in many fields of industry.

To broadcast before the unionized population of Uniontown and vicinity the statement on the placard that plaintiff is unfair to organized labor under these circumstances, is equivalent to the General Assembly of the Presbyterian Church publicly declaring that the Roman Catholic Church is unfair to organized religion. Both are broadly-recognized members, with different views, of a universal church, based upon the language of its Founder. For either to picket the other and seek to gain advantage by means of a statement that the other is unfair to such organized institutions is clearly a false statement amounting to a fraudulent misrepresentation.

When such false statement is coupled with the avowed purpose of coercing plaintiff into the performance of an illegal act, consisting of a breach of his contract, it becomes plainly evident that the entire purpose and the entire effect of the picketing by defendants is the unlawful coercion of plaintiff into the performance of such unlawful act.

We cannot accept the contention of defendant that this placard only expressed the views of the two defendant

locals. Their name and number closely followed the language: "Unfair to organized labor" on the placard. The natural inference to be drawn by a reader of the legend would be that these defendant unions were announcing to the world that plaintiff is unfair to organized labor.

Both the purpose and the manner of carrying on the picketing are unlawful.

Unless inhibited by legislation or judicial decision by court of last resort, this unlawful picketing should be restrained.

Are we prohibited by judicial opinion, or legislative act, from restraining the conduct of defendants by injunction?

Defendants earnestly contend that the case is ruled in their favor by Kirmse et al. v. Adler et al., 311 Pa. 78. We cannot agree with that contention. We think the heart of that decision is found in the discussion by Mr. Justice Kephart, at page 86:

" 'A peaceful effort, individually, collectively or concertedly, to bring about *a cessation of labor* in order to enforce a demand for betterment of wage or living conditions, even though the indirect purpose is accomplished, is not unlawful.

" 'While the right to form combinations, and through a strike to exert means to prevent men from working, may be lawful, *it remains so only as long as the means employed are lawful.*' If the words 'cessation of labor' in this quotation are removed and 'cessation of patronage' are substituted, it is apparent that the question in this case narrows down to whether the means here employed are lawful. *Unless the means employed are unlawful, the motive for the acts is immaterial.*" (Italics supplied.)

Having found as a fact that the means employed by defendants in this case are unlawful, and it also appearing that the purposes for which the picketing was employed are unlawful, the present case is clearly distinguished from the cited authority wherein Mr. Justice Kephart was moved to say (p. 86):

"There is absolutely no evidence or inference of intimidation or coercion that can be drawn from the evidence."

He also says at page 87 that the language used on the placards in the cited case, "involved no element of coercion or intimidation, either as a fact or in the legal sense of these terms."

Thus also is the case distinguished from the one before us.

It is also earnestly contended that an injunction is prohibited by the terms of the Labor Anti-Injunction Act of June 2, 1937, P. L. 1198. Section 3 of that act, in paragraphs (a), (b), and (c), defines the character of relationship by reason of which a case shall be held to involve or to grow out of a labor dispute.

We need not determine whether the facts in our case constitute a labor dispute or not.

In our seventh finding of fact, we have determined that defendant organizations "are competing for membership, of plaintiff's employes, and are engaged in a course of conduct calculated to coerce the plaintiff into the commission of a violation of his agreement with the Malt Beverage Distributors Local Industrial Union".

If, before June 9, 1939, the facts of our case brought it within the Labor Anti-Injunction Act, it is specifically removed therefrom by an amendment to that act of date, June 9, 1939, P. L. 302.

After quoting for amendment section 4 of that act, the legislature, by way of amendment, added a proviso, as follows:

"Provided, however, That this act shall not apply in any case –

"(a) Involving a labor dispute, as defined herein, which is in disregard, breach, or violation of, or which tends to procure the disregard, breach, or violation of, a valid subsisting labor agreement arrived at between an employer and the representatives designated or selected by the employes for the purpose of collective bargaining,

as defined and provided for in the act, approved the first day of June, one thousand nine hundred and thirty-seven (Pamphlet Laws, one thousand one hundred sixty-eight.
. . . .

"(*b*) Where a majority of the employes have not joined a labor organization, or where two or more labor organizations are competing for membership of the employes, and any labor organization or any of its officers, agents, representatives, employes, or members engages in a course of conduct intended or calculated to coerce an employer to compel or require his employes to prefer or become members of or otherwise join any labor organization.

"(*c*) Where any person, association, employe, labor organization, or any employe, agent, representative, or officer of a labor organization engages in a course of conduct intended or calculated to coerce an employer to commit a violation of the Pennsylvania Labor Relations Act of 1937 or the National Labor Relations Act of 1935."

It requires no argument to demonstrate that all of these subsections are invoked by the facts that we have found. There can therefore be no doubt that our jurisdiction in equity is not withdrawn by reason of the Labor Anti-Injunction Act, supra.

We have the duty of considering the entire scope of legislation and judicial decision, the purpose of which was to emancipate labor from the inequalities from which it suffered because of the existence of corporate organization on the part of capital, while individual laborers were handicapped by lack of effective legal opportunity to similarly organize.

The legislative intent to extend a helping hand in aiding labor organization is apparent in many different enactments.

Our Pennsylvania legislature, preliminary to the Labor Anti-Injunction Act, supra, declared the public policy of this Commonwealth to be: . . .

[The court here quoted section 2 of the Labor Anti-Injunction Act.]

In adopting the Act of Assembly of June 1, 1937, P. L. 1168, frequently referred to as "The Little Wagner Act", and authoritatively cited as the "Pennsylvania Labor Relations Act", the legislature likewise saw fit to declare the public policy of Pennsylvania as follows: . . .

[The court here quoted section 2 of the Pennsylvania Labor Relations Act of June 1, 1937, P. L. 1168, in full.]

Section 5 of the Pennsylvania Labor Relations Act, supra, uses this language:

"Rights of Employes.—Employes shall have the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection."

Section 6 specifies, under headings $(a)$, $(b)$, $(c)$, $(d)$, and $(e)$, what shall constitute unfair labor practices.

Subsection $(e)$ defines as an unfair labor practice the refusal by the employer "to bargain collectively with the representatives of his employes, subject to the provisions of section 7 $(a)$ of this act":

"Section 7. Representatives and Elections.—$(a)$ Representatives designated or selected for the purposes of collective bargaining by the majority of the employes in a unit appropriate for such purposes, shall be the exclusive representatives of all the employes in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment. . . ."

Power is given to the labor board, a body provided for in this act, to prevent unfair labor practices, these powers being specifically enumerated in section 8 of the act.

All these provisions of this act of assembly are cited here to make it entirely clear that the purpose and manner of the picketing indulged in by defendant was in

absolute conflict with the public policy of the Commonwealth, as disclosed by the declaration of her legislators.

Should plaintiff breach the bargain that he made collectively with the representatives of one hundred percent of his employes, he would clearly be violating paragraph (e) of section 6 above quoted.

In addition, Congress adopted the National Labor Relations Act of July 5, 1935, 49 Stat. at L. 449, 29 USC §151 et seq, the principal provisions of which run parallel with our State legislation. In 1932, Congress passed the Norris-La Guardia Act of March 23, 1932, 47 Stat. at L. 70, 29 USC §101 et seq, an almost exact counterpart of our Labor Anti-Injunction Act.

Along with this legislation, we must notice the trend of labor decisions in a long line of Federal cases. For instance, such as National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U. S. 1, wherein it was held that the manufacturing business as conducted by the Jones & Laughlin Corporation is within and not without the area of interstate commerce, thus making all labor relations appurtenant thereto subject to Federal regulation; whether such manufacturing or even other activity involves a large steel corporation, or the manufacture of tractors and automobiles: National Labor Relations Board v. Fruehauf Trailer Co., 301 U. S. 49; or National Relations Board v. Friedman-Harry Marks Clothing Co., 301 U. S. 58; or the operation of interstate buses: Washington, Virginia & Maryland Coach Co. v. National Labor Relations Board, 301 U. S. 142; or the publishing of newspapers: Associated Press v. National Labor Relations Board, 301 U. S. 103; or even the canning of fruit: Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U. S. 453. All are now subject to a new Federal regulation because of labor relations appurtenant thereto.

All this legislation and change in the trend of judicial decision has been purposefully directed toward the emancipation of labor in its relations with its capitalistic employers.

Nothing should be clearer than the fact that these legal aids to genuine collective bargaining and other means of protection for the interests of united organized labor were not intended to place in the hands of rival labor organizations the weapon by which the business of struggling employers might be, or inevitably would be, totally destroyed. When the advantages which have been placed in the hands of labor are subverted to the unlawful use of any system of attack upon genuine collective bargaining contracts with any employer, wherein the purpose is to strengthen one unit and weaken its rival, it is as much the duty of the chancellor to extend the strong arm of equitable jurisdiction and stop the struggle as it is the moral and legal duty of the contending rivals to cease such destructive practices. It must be plain from a long view, and from the reaction that is already noticeable among the natural friends of organized labor, that a continuance of fratricidal struggle between the two National organizations of organized labor must result in the withdrawal of the advantages that have arisen from the friendly attitude of State and National legislative bodies toward collective bargaining and the favorable opinion of the general public.

In our own State, the results growing out of this internecine war between the C I. O. and A. F. of L. have already resulted in the adoption of the amendment of June 9, 1939, P. L. 302.

The very words of section 4(*a*) plainly indicate such results. The withdrawal of the benefits found in such large proportions in the Labor Anti-Injunction Act from cases where the dispute is in disregard, breach or violation of, or tends to procure the disregard, breach or violation of a valid subsisting labor agreement arrived at between an employer and the representatives designated or selected by the employes for the purpose of collective bargaining, plainly shows that the legislative intent is to regard as unlawful, and subject to injunctive restraint, any act, the manner or purpose of whose carry-

ing out is intended to coerce an employer into the breach of a valid agreement.

The Pennsylvania law-making body, in session in 1937, could scarcely foresee conditions such as are disclosed by the testimony in this case. The law-making body, in session in 1939, could not help but notice the extensive and varied activities of the rival labor organizations, wherein the war of the one upon the other put in dire jeopardy not only the rights of the small employer but the legitimate interest of the entire consuming population of the State.

The session of 1937 withdrew from the courts the right, under most conditions, to issue injunctions in cases involving labor disputes.

The session of 1939 restored to the courts the right to issue injunctions in labor disputes where picketing, as a coercive act, such as is present in this case, was resorted to for a specific purpose.

We cannot conceive it to be the duty of this court to stand idly by and see the property rights of the owner of a small business completely destroyed by reason of a struggle between two contending organizations for the right to represent the small number of his employes for collective bargaining.

Finally, it is asserted that the right to picket is a constitutional right, and that it may be exercised without restraint. It is contended that, like the right to free speech, a free press, and free assembly, the constitutional right to picket may be indulged at all times and under all circumstances. The argument leads logically to the conclusion that, because it is lawful for picket lines to form, the line may be formed for the accomplishment of an unlawful purpose without restraint. In other words, an unlawful act may not be restrained because the performer of the act is exercising a constitutional privilege. It might as well be argued that the right of free speech confers the right to destroy, by false assertion, the reputation of any citizen. It is equivalent to saying that the right of free

assembly, under the Constitution, cannot be restrained when such assembly engages in the unlawful purpose of interfering, by a mere presence of numbers, with the daily routine of any place of business, school, church, or other institution.

To state this proposition is to answer it. The latest deliverance of Justice Brandeis, to the effect that picketing is a constitutional right on a par with the other privileges enumerated in the Bill of Rights, connotes the exercise of all these constitutional privileges in a lawful manner.

Having concluded that the manner and purpose of the maintenance of a picket on the streets before the place of business of plaintiff is unlawful, in that it avowedly is maintained for the purpose of compelling plaintiff's employes to join defendant union and to coerce plaintiff into a breach of his collective bargaining contract with all his employes, it follows that the conduct of defendants should be restrained by injunction. . . .

### Decree nisi

Now, January 24, 1940, upon consideration of the foregoing case, it is ordered, adjudged, and decreed nisi, as follows:

A permanent injunction is directed to issue, enjoining and restraining defendants, Bartenders' International Alliance, Uniontown Local No. 78, John O'Hern, president, and Hotel and Restaurant Employees' International Alliance, Uniontown Local No. 389, Mary Evans, president, their agents and servants from

(a) Picketing and patrolling the public street in front of plaintiff's business.

(b) The advertising that there is a labor dispute between plaintiff and organized labor.

(c) Persuading persons not to contract with plaintiff for employment.

Defendants shall pay the costs.